IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs in Knoxville May17, 2017

**STATE OF TENNESSEE v. JIMMY WILLIAMS**

**Appeal from the Criminal Court for Shelby County**
**No. 14-04175          Lee V. Coffee, Judge**

_____

**No. W2016-00946-CCA-R3-CD**

_____

A Shelby County jury convicted the Defendant, Jimmy Williams, of aggravated assault. The trial court sentenced the Defendant as a career offender to fifteen years in prison. On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction and that the trial court erred in sentencing him as a career offender. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Laurie W. Hall (at trial and on appeal) and Juni Gangult (at trial), Memphis, Tennessee, for the appellant, Jimmy Williams.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Abby Wallace, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

This case arises from allegations that the Defendant assaulted the victim, Tracy Vaughn, on July 27, 2008, in a field behind some commercial establishments. With regard to these allegations, a Shelby County Grand Jury indicted the Defendant for two counts of aggravated rape. At trial, the parties presented the following evidence: The victim, who was in her late twenties at the time of these events, testified that during the night of July 26, 2008, and into the morning hours of July 27, 2008, she had been

"hustling" in the neighborhood all night. At around 11:00 p.m. or 12:00 a.m., she saw the Defendant, whom she had never seen before, as she was leaving a night club. After she saw him, she continued "just hustling around in the neighborhood."

At some point, the victim, who was with a "young man," went to a Mapco, which she described as a neighborhood store where people from the neighborhood would hang out. She and the young man were conversing about walking home, and the Defendant approached them and said that there was a nearby pathway that served as a shortcut to her destination. The victim said that she told the young man that something did not feel right to her and that she felt as if she was being watched. He agreed. The victim gave the man she was with a "couple of dollars" and told him to go home.

The victim said that she saw the Defendant again at the Mapco and that, by then, it was daylight. He offered to show her the pathway because he was going that direction also. The victim recalled that at the time she had torn ligaments in her knee and could not run. When they arrived at the pathway she decided not to enter, telling the Defendant "no, I ain't going to go. I'm straight." As she turned to leave, the Defendant grabbed her and said, "Bitch, you not going nowhere."

The victim testified that she protested, and the Defendant hit her. She said that he started beating her, hitting her face with a closed fist. The Defendant repeatedly told her that she was not going anywhere and that he "got" her. The victim said that the Defendant told her that she was going to "give him some head," and the victim told the Defendant that she had children. She said that the Defendant hit her again, telling her to perform oral sex upon him. The victim recalled that the Defendant removed his clothing and forced the victim to perform oral sex.

The victim said that the Defendant told her that he had a house where he was going to take her, and she again reminded him that she had children and asked him not to hurt her. The Defendant told her to "[s]hut up" and started pacing. He said he could not let her go because he had beaten her too badly. The victim feared for her life and cooperated with the Defendant. She estimated that this ordeal lasted approximately two hours.

The victim said that the Defendant pulled her toward a grassy area and again made her perform oral sex. He said he was going to get her "high," and she informed the Defendant that she did not use drugs. The Defendant then pulled out a box cutter that had a little curve on it, and he hit her in the head with that. The victim said that she grabbed a beer bottle that was on the ground and tried to hit the Defendant with it. She said that she did not think that the bottle broke but that, when she eventually went to the emergency room, she had the Defendant's blood on her.

2

The victim recalled that some people walked by the area where the Defendant was hitting her. She screamed at them to help her. The Defendant told the people, "[T]his is my 'ho. This is my bitch, man. We just going through something." The people continued walking but must have called 911. About twenty or thirty minutes later, she and the Defendant were surrounded by police officers with guns. The victim was taken by ambulance to the hospital.

The victim said that she suffered injuries to her head. She had swelling in her face, her head was swollen, and she had two black eyes. After being treated at the hospital, she was examined at the Rape Crisis Center, where she was photographed, examined, and interviewed.

The victim said that, six years after this assault, a detective showed her photographs and she recognized the Defendant as her assailant. The victim admitted that she had been convicted of theft of property over thirty-five times.

During cross-examination, the victim was asked about and responded to each of her theft convictions. She further explained that, on the night leading to this assault, she was "hustling," which meant that she was selling drugs. She agreed that, while she had testified that the Defendant only forced her to perform oral sex on him, she told police after this incident that he had also vaginally and anally raped her. The victim said that the Defendant had not anally raped her.

The victim did not recall giving police details about a vaginal rape, including that he threatened her with a razor blade and choked her while pulling down her pants. She maintained that he only forced her to perform oral sex upon him. The victim said that her head trauma from the assault was to blame for the discrepancy in her statement and her testimony. The victim denied that the Defendant performed oral sex on her, and she said that the police department was "lying" if they included that she said that in the paperwork. She agreed that her statement reflected that she told the police that the Defendant "ate [her] p***y, and he also bit it." Her statement then included that he pulled out a tissue with a used condom in it. She then stated that the portion of her statement about the used condom was true. She further conceded that she refused to take a drug test at the rape crisis center because she already had drugs in her system.

During redirect examination, the victim testified that she had reviewed her statement before trial and felt that it contained some inaccuracies. She said that, at the time of trial, she only recalled the Defendant forcing her to perform oral sex and did not recall any other sexual penetration. She agreed that eight years had lapsed between the time of the incident and the trial.

3

Billy Mukes testified that he lived near the pathway involved in this case. He said that every day, all day long, people used that pathway to cut through from one street to another. Mr. Mukes recalled that, on July 27, 2008, he called the police. He explained that, before he called police, he saw three men looking down the railroad track near the pathway. He asked the men what was wrong, and they informed him that there was a female "hollering" in the field. Mr. Mukes heard the woman scream, and he went to investigate. He saw a man with his arm around a woman. After she saw him, she stopped screaming, so Mr. Mukes thought that maybe everything was okay. When he returned home, he heard her again screaming, so he called 911.

Mr. Mukes said that, after the police arrived, the Defendant ran out of the pathway away from the police. Mr. Mukes recognized the Defendant, whom he had known since they were children. Mr. Mukes said that he also knew the victim personally, but he did not see her or learn of her identity until after this incident.

During cross-examination, Mr. Mukes estimated that it was between nine or ten in the morning when he called the police. He said that, when he saw the Defendant and the victim off the pathway, they were "[j]ust sitting." The two were not struggling, but the Defendant had his arm around the victim's neck. The victim did not ask for help or try to get away from the Defendant. Mr. Mukes said that he never saw the Defendant threaten the victim or with his pants down. He said that people often frequented that area. Mr. Mukes said that after he and the other men left, they heard the victim scream again so they called the police. The officers responded "immediately."

Horace Granger testified that he lived across the street from Mr. Mukes and could also see the railroad tracks from his house. Mr. Granger said that, on July 27, 2008, he was standing near his home when he heard screaming coming from the field by the path. Mr. Granger, who had been drinking, did not pay much attention to the noise. Mr. Granger said that, as the screaming continued, he walked toward the noise. He saw a man and a woman but he could not tell who they were or what they were doing. He turned around and went back home. After he returned home, he heard more screaming. He knew that Mr. Mukes had called the police, so he did not go down there again. He watched as the Defendant came running from the pathway and was apprehended by police.

During cross-examination, Mr. Granger testified that, when he saw the Defendant and the victim in the field, they were sitting next to one another, and the victim was not screaming. Mr. Granger said he did not notice blood on either person.

4

Leman Walker, a Memphis Police Department ("MPD") officer, testified that, on July 27, 2008, he responded to a 911 call about a woman's screams coming from a grassy area near the pathway. He and his partner, Paulelle Gilliam, arrived at around 8:30 a.m. and walked on the pathway. Officer Walker testified that, off the pathway, he saw the victim standing in the field with what appeared to be blood on her shirt, and she was waving at them. Officer Walker approached the victim, who pointed out the direction that the Defendant had gone. Officer Walker said that there were other officers on the scene, and he contacted them and told them the direction in which the Defendant had gone. Officer Walker testified that the victim appeared "kind of shaken up, . . . real distressed and just real dirty, like she had been . . . wrestling or something like that." He said that she had dirt and blood on her clothing. During cross-examination, Officer Walker testified that the victim told him that she had been cut during the attack. He was unsure whether that allegation was true.

Answering a question from the jury, Officer Walker testified that the victim had "abrasions and so forth on her" when he saw her. She was taken to the hospital, however, so he did not photograph or examine her. He also noted that the victim appeared as if she had been in a fight, but he did not go physically look to see if she had a head wound. He said that she complained of a head injury and of being hit in the head multiple times.

Wynterence Moultry, a MPD officer testified that his responsibilities included canvassing the area for a man. As he was doing so, he saw the Defendant appear from the grassy area. The Defendant proceeded in the opposite direction of Officer Moultry, so the officer pursued him on foot. After a couple of minutes of pursuit, Officer Moultry took the man into custody. The officer said that he eventually transported the Defendant to the police station. During cross-examination, Officer Moultry made clear that the Defendant ran away from the police officers when he saw them. He agreed that the Defendant was not charged with evading arrest or resisting official detention.

Charles Cathey, an MPD Crime Scene Investigation Unit officer, testified that he photographed the wooded area by the rail road tracks where the alleged rape had occurred. He described the area as an empty field between the railroad tracks and some businesses that lay at the end of a dead end street. Officer Cathey testified that, at the scene, he found a gray, bladed box cutter on the ground, which had a red spot, possibly blood, on it. Officer Cathey said that he also responded to the hospital and photographed the victim. He noted that the victim had bruising to her face, neck, and arm. Both sides of her face were swollen. She wore a tan shirt that appeared to have blood spots on it. Officer Cathey showed these photographs to the jury.

Sally DiScenza, a sexual assault nurse examiner with the Rape Crisis Center in Memphis, testified that she interviewed and examined the victim on July 27, 2008, at

5

around 1:00 p.m.  The victim told her that she had been assaulted behind a building by a man, who hit her multiple times in the face.  The victim told Ms. DiScenza that, as she struggled against him, he got more vicious and that he orally, vaginally, and anally penetrated her.  The victim said that the man did not use a condom, that he did not ejaculate when he penetrated her orally, and that she was unsure whether he ejaculated when he penetrated her vaginally and anally.  Ms. DiScenza said that the victim explained having blood on her shirt by saying that, during the struggle, she hit the man with a bottle, causing him to bleed.

Ms. DiScenza testified that she physically examined the victim.  She noted injuries to the victim's face, arms, and upper legs, all of which she photographed.  Ms. DiScenza said that the victim had bruises on her arms and into her shoulder area, which she also photographed.  The victim also had swelling and bruising in her facial area, on her forehead and under her eye.

Ms. DiScenza testified that she conducted a genital examination during which she did not observe any injuries, which was not uncommon in sexual assault cases.  She collected swabs from the victim's genitals as well as her mouth to test for DNA.  Ms. DiScenza also collected the victim's clothing.

During cross-examination, Ms. DiScenza testified that the victim had told her that she went behind the building where she was assaulted to make a "transaction."  The victim told her that she was assaulted at around 2:30 a.m. and that the person who attacked her had hit her in the face with his fist.  The victim did not mention a box cutter.  Ms. DiScenze testified that her report indicated that the victim "engaged in inappropriate laughter" during their conversation.  She further noted that the victim reported being on "pain medications" but did not know which ones she had taken.

During redirect examination, Ms. DiScenza agreed that not every victim reacted to sexual assault in the same way.

Anthony Carter, a lieutenant with the MPD, testified that he investigated this case.  He said that, when he responded, the victim had already been transported to the Rape Crisis Center.  He did not speak to the victim face-to-face that day, but he took her statement via telephone.  Lieutenant Carter did not get a formal statement from the victim until July 30.  Lieutenant Carter said that DNA swabs of both the Defendant and the box cutter were taken and sent to Tennessee Bureau of Investigation for analysis.

During cross-examination, Lieutenant Carter testified that he did not yell at or berate the victim.  He said that he asked Ms. DiScenza to conduct a drug screen for cocaine but that test was not done.

Donna Nelson, a Tennessee Bureau of Investigation ("TBI") special agent, testified that the analysis taken from the victim did not reveal the presence of any semen on any of the swabs. The box cutter contained a mixture of at least two individuals, but neither was the victim. The Defendant was not excluded as a contributor. Analysis of the victim's shirt revealed the Defendant's blood in five areas.

Based upon this evidence, the jury acquitted the Defendant of the charged offenses of aggravated rape but convicted him of one count of the offense of aggravated assault[1], a Class C felony.

## B. Sentencing Hearing

The State entered certified copies of the Defendant's prior felony convictions, which included among others: attempted rape; robbery; attempted aggravated assault; burglary of a building; attempted carjacking; attempted arson; rape; aggravated assault; and attempted aggravated assault. The Defendant had also been convicted of violating his probation. The trial court also admitted the State's notice to seek enhanced punishment. The State originally filed its notice of intent to seek enhanced punishment in another case, indictment 12-06403, on January 27, 2014.

The Defendant argued that, despite his criminal record, he should be sentenced as a Range I, standard offender because the State's notice of intent to seek enhanced punishment was not timely filed. He asserted that the notice was not filed ten days before trial, as the statute requires, but, instead, was filed on February 4, 2016, after closing arguments in the trial.

The State countered that the Defendant had fair warning that it intended to use his prior criminal history to seek an enhanced sentence because of the notice filed in another case at a time when both the indictment in that case and the indictment in this case were pending. The State argued that exclusion of the notice on these grounds would be a hyper-technical application of the statute and in contravention of case law.

When sentencing the Defendant, the trial court found that the Defendant had nine felony convictions and multiple misdemeanor convictions and that he qualified as a career offender. The trial court then found that the State's notice was adequate and that the Defendant had actual and constructive notice of the State's intent to seek enhanced punishment. The trial court sentenced the Defendant as a career offender to fifteen years, to be served at 60%. It is from this judgment that the Defendant now appeals.

---

[1] The Defendant requested that aggravated assault be charged to the jury, amending the indictment.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, the Defendant argues that the evidence is insufficient to sustain his conviction because witnesses who saw the Defendant and the victim during the alleged assault did not see the Defendant hit or strike the victim. Further, he argues that the only testimony supporting the conviction came from the victim, whom he asserts is unreliable. The State responds that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt by the evidence provided. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the

testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

An offender commits assault who "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury . . . ." T.C.A. § 39-13-101 (a)(2). A person commits aggravated assault by committing an assault as defined in Tennessee Code Annotated section 39-13-101 and uses or displays a deadly weapon during such act. T.C.A. 39-13-102 (a)(1).

In this case, the evidence, viewed in the light most favorable to the State, proves that on July 27, 2008, the Defendant tried to persuade the victim to follow him to a cut through in a field. When she refused the Defendant's proposal, he grabbed her around the neck and hit her in the face several times with a closed fist when she tried to escape his hold on her. The Defendant later displayed a box cutter and hit the victim with its handle. Mr. Mukes testified that he heard the victim screaming in the field behind his home and called 911. As police arrived on the scene, the Defendant fled, but officers eventually apprehended him. The victim suffered bruising to her face, neck, and arms as well as swelling to both sides of her face. Officers found a box cutter on the ground at the scene.

Issues of credibility are classic jury questions. *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville,

9

Aug. 25, 2005). And, as stated above, questions concerning the credibility of the witnesses are resolved by the trier of fact. *Bland*, 958 S.W.2d at 659. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. By its verdict, the jury found the victim's testimony credible and believed that she was struck by the Defendant while he was in possession of the box cutter. Based upon the evidence, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that the Defendant knowingly caused bodily injury to the victim while in possession of a deadly weapon. Thus, the Defendant is not entitled to relief as to this issue.

## B. Notice

On appeal, the Defendant contends that he was wrongly sentenced as a Career Offender because he was not given proper notice of the State's intent to seek an enhanced sentence against him. Specifically, the Defendant contends that the State's untimely notice prejudiced him by circumventing his ability to file for a continuance and his ability to adjust his trial strategy. The State argues that the Defendant was given actual and constructive notification by the information it filed on a companion case that was pending at the same time as this case and therefore, cannot claim to have been ignorant of or prejudiced by the State's intention to seek enhanced sentencing against him.

When the length, range, or manner of service of a sentence is challenged, this Court must conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2016). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, *Sentencing Comm'n Cmts* (2016). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, the appellate court may not disturb the sentence even if a different result was preferred. T.C.A. § 40-35-103 (2016); *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). This presumption, however, does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn.Crim.App.2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn.Crim.App.1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn.Crim.App.1994). The question raised in this case rests primarily on an issue of law; therefore, our review is *de novo* with no presumption of correctness given to the findings of the lower court on whether the Defendant had adequate notice of the State's intention to seek enhanced punishment against him. *State v. Livingston,* 197 S.W.3d 710, 712 (Tenn. 2006) (*citing State v. Davis,* 940 S.W.2d 558, 561 (Tenn.1997)); *State v. Carter*, 121 S.W.3d 579, 584 (Tenn. 2003).

Tennessee law requires the State to provide written notice to a defendant that the State intends to seek enhanced punishment if the defendant is convicted. T.C.A. § 40-35-202(a) (2016). The notice must be given at least ten days before trial or the acceptance of a guilty plea and should provide the types of convictions, dates of convictions, and identity of the courts of conviction. *Id.* Our Supreme Court, in *State v. Livingston*, explained the purpose of this statute:

> The purpose of the statutory notice of intent to seek enhanced sentencing is to (a) provide fair notice to an accused that he/she is exposed to other than standard sentencing, (b) to facilitate plea bargaining, (c) to enable the accused to make an informed decision before entering a guilty plea, and (d) to a certain extent, to aid in trial strategy.

197 S.W.3d 710, 712 (Tenn. 2006) (emphasis added) (citing *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990)). Also, the Court in *State v. Livingston* held that "[w]hile 'perfect' notice is not required . . . some notice meeting the minimal requirements of the statute must be given." *Livingston*, 197 S.W.3d at 713. At minimum, the statute requires that "the State file: (1) written notice, (2) clearly expressing the State's intention to seek sentencing outside of the standard offender range, (3) setting forth the nature of the prior felony convictions, and the identity of the courts of the convictions." *Id.* at 713-14 (footnote omitted). However, the Court later explained that if the State's notice of intent to seek enhanced punishment is filed late or filed timely but defective, a defendant "must show prejudice before the notice will be rendered ineffective." *State v. Carter*, 121 S.W.3d 579, 585 (Tenn. 2003) (citing *State v. Stevenson*, 752 S.W.2d 80, 81 (Tenn. 1998)). Further, the Supreme Court has held that "when the State has substantially complied with Section 40-35-202(a), an accused has a duty to inquire about ambiguous or incomplete notice and must show prejudice to obtain relief." *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990). The Court has concluded that the purposes of the notice requirement are satisfied when "the defendant is not misled or surprised by the State's decision to seek enhanced sentencing." *Livingston*, 197 S.W.3d at 713; *State v. Chase*, 873 S.W.2d 7, 9 (Tenn. Crim. App. 1993).

We must decide whether the notice filed by the State before this trial, specifically the notice of intent to classify the Defendant as a career offender for sentencing in a previous trial, satisfies the purpose of filing a notice of intent to seek enhanced punishment as required by Tennessee Code Annotated section 40-35-202(a). The Defendant contends that, because the State filed its notice of intent to seek an enhanced sentence against him after closing arguments, his ability to ask for a trial continuance or adjust his trial strategy was circumvented and therefore, he was

prejudiced. The Defendant offers a strict reading of Tennessee Code Annotated section 40-35-202(a) to support his claim, as well as emphasizing what the Court in *Livingston* articulated as the purpose of the statute. The State argues that the notice filed while the two indictments were pending gave the Defendant constructive notice that the State was seeking an enhanced sentence should the Defendant be convicted pursuant to either indictment. The trial court agreed, finding:

[The State's attorney] gave [the Defendant] actual notice of his range of punishment. She gave [the Defendant] actual notice of her intent to seek enhanced punishment against him should he be convicted after a trial. She gave [the Defendant] actual notice in a filing in 2014 in a companion case, and, again, both of these cases were pending at the same time. [The State's Attorney], on January 2nd, 2014, gave [the Defendant] actual notice that, "If you are convicted of anything, the State will seek enhanced punishment against you as a career offender." So, not only was [the Defendant] given constructive notice, he was given actual notice. This Court told [the Defendant] on at least two different occasions that, should he be convicted, the state of Tennessee was seeking enhanced punishment against him . . .

[T]here's been no showing of prejudice in this hearing. [No showing] that somehow the Defendant has been prejudiced because the state of Tennessee did not refile a notice that had been filed on January 2, 2014, informing [the Defendant] that, "If you are convicted, the state will seek enhanced punishment." And *State v. Debro*, 787 S.W.2d 932, 933-34 (Tenn. Crim. App. 1990) and other cases that I've looked at indicate that the notice does not have to be perfect, that it's not like an indictment in which the State is held to the strict corners of an indictment . . . [I]n this case, [the Defendant] had constructive notice and he had actual notice. . . . And I do find . . . that [the Defendant] was given actual notice. He was given constructive notice on the companion case, and these cases were, in fact, pending at the same time. The state made an election to try one before the other, and [the Defendant] absolutely knew what his range of punishment was, absolutely knew that the state of Tennessee was seeking enhanced punishment against him, and [the Defendant] has not indicated anything in this hearing that would indicate that, "Judge Coffee, I'm surprised, I'm prejudiced," because, as the law indicates, he cannot be held to claim ignorance or to say, "I had no idea what my record was."

And, based on all of those findings, this Court does find that [the Defendant] is, in fact, a career offender. He has more than enough convictions in order to justify his classification as a career offender.

12

The trial court's ruling primarily relies on the interpretation of the statute set out in *State v. Debro*, 787 S.W.2d 932 (Tenn. Crim. App. 1989). In *Debro*, there were two indictments filed against the Defendant, Mary Debro, which were both pending trial at the same time. *Debro*, 787 S.W.2d at 932. She was first tried on one of the indictments, in which the State of Tennessee had filed a notice to seek enhanced punishment, and the jury found Ms. Debro not guilty under that indictment. *Id.* at 933. She was then tried on the other indictment, which notice had been filed on the previous companion case, and the jury subsequently found her guilty after that trial. *Id.* The defendant's argument in *Debro* was that she did not have constructive notice that the State of Tennessee intended to seek enhanced punishment because the notice had been filed in a companion case, for which she had been acquitted, and not in the present case for which she was ultimately convicted by a jury. *Id.* The defendant further contended that the defect in the State's notice was so substantial that it was void and amounted to no notice at all for the second case. *Id.* The State argued that the defendant had constructive notice of its intent by the filing of the formal notice, which met the time requirements of Rule 12.3, Tennessee Rules of Criminal Procedure. The State further argued that the Defendant could not claim to be prejudiced because she had actual knowledge of the State's intent and her offender status by the information timely filed on the previous case. *Id.* The Court in *Debro* emphasized the requirement that the defendant show prejudice as an essential element to the granting of relief in a case of flawed notice, as it was in the *Stevenson* case. *Id* at 934 (citing *State v. Stevenson*, 752 S.W.2d 80, 81 (Tenn. 1988)). The Court then held that the defendant could not claim ignorance "to allegations in the sentencing notice involving the defendant's prior record or release status, even though those allegations must be proven beyond a reasonable doubt to the trial judge's satisfaction." *Debro,* 787 S.W.2d at 934. Ultimately, the Court in *Debro* held that "no prejudice could have been shown because the defendant had both actual knowledge of her release status and constructive notice of the state's intent through the notice filed in the companion case." *Id*.

In the present case, the trial court interpreted the *Debro* case to conclude that a defendant must show prejudice by the State's untimely or defective filing of a notice to seek an enhanced sentence against him and a defendant cannot show prejudice when they had constructive knowledge of the State's intent. We agree with the trial court and hold that the State's notice of its intent to seek enhanced punishment filed in the other pending indictment provided adequate notice to the Defendant of its intent to seek enhanced punishment. The first notice that was filed on the companion case made the Defendant aware of the nature of his past felonies and that he qualified as a career offender. Also, the information filed in the companion case gave the Defendant constructive notice of the State's intent to pursue a career offender sentence. Additionally, the Defendant made no inquiry into the "ambiguous or incomplete" nature of the original notice on how it would

13

apply to the second case, as required by *Adams,* 788 S.W.2d 557 at 559. Although it cannot be said that the State filed a timely notice of its intent to classify the Defendant as a career offender in this specific case, the Defendant must show prejudice to be granted relief, and we are unable to find any prejudice that the Defendant may have suffered as a result of any inadequacy of notice. Therefore, the Defendant is not entitled to relief as to this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE